**Sharon BREKKE, Plaintiff,**

v.

**CITY OF BLACKDUCK, Defendant.**

**No. CIV. 6–95–163(RLE).**

United States District Court,
D. Minnesota,
Sixth Division.

March 28, 1997.

Susan Anderson McKay, McKay Law Office, Bemidji, MN, for Plaintiff.

Larry Charles Minton, Minton Law Office, Hibbing, MN, for Defendant.

## MEMORANDUM ORDER

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to the consent of the parties, as authorized by Title 28 U.S.C. § 636(c)(3), upon the Defendant's Motion for Summary Judgment.

A Hearing on the Motion was conducted on September 5, 1996, at which time the Plaintiff appeared by Susan A. McKay, Esq., and the Defendant appeared by Larry C. Minton, Esq.

For reasons which follow, the Defendant's Motion is granted in part, and denied in part.

### II. *Factual and Procedural History*

The Plaintiff is a Licensed Practical Nurse and a State-certified Emergency Medical Technician ("EMT"). The Defendant is a political subdivision of the State of Minnesota. At all relevant times, the Defendant owned and operated the Blackduck Ambulance Service ("Ambulance Service"), whose purpose it was to provide ambulance assistance to the residents of Blackduck. In 1981, the Plaintiff began working for the Ambulance Service, in a part-time capacity, as a "volunteer."[1] On June 4, 1985, at a Blackduck City Council ("City Council") meeting, the Plaintiff was hired as the Ambulance Service's full-time "Ambulance Director," and she began serving in that capacity on the following day.[2] The need for, and the partic-

---

1. For the duration of its existence, the Ambulance Service was dependent on the services of part-time "volunteers," to meet its staffing needs. Indeed, the Record reveals that the Plaintiff was the Ambulance Service's only full-time employee, for the period from June 5, 1985, until April 18, 1995, which was the date on which the Blackduck City Council voted to discontinue the Ambulance Service's operation. The volunteers served in what was, in essence, an "on-call" capacity and, therefore, a volunteer, who was assigned to cover a particular work, was not required to maintain a continuous physical presence at the Ambulance Service's garage but, instead, the volunteer would be assigned a paging device, which would notify him, on those occasions when an actual emergency arose, that the assistance of the Ambulance Service—and,

hence, the volunteer—was needed. As compensation, the volunteers received a *de minimis* wage—which, at the closing of the Ambulance Service, was set at $1.00, for each hour in which they merely served "on-call," and they would receive a higher rate of pay—namely, $7.00 as of the time that the Ambulance Service was discontinued—for the hours in which they were actually required to respond to emergencies.

2. The Record discloses that, during her employment with the Ambulance Service, the Plaintiff's position was varyingly styled as the "Ambulance Director," "Ambulance Coordinator," "Ambulance Services Coordinator," and "EMS Coordinator." For ease of reference, we shall employ the designation of "Ambulance Director"

ulars of the position were detailed in the following job description, which was contemporaneously promulgated by the City Council:

> Due to a severe shortage of daytime personnel, the Blackduck Ambulance Association[3] is recommending the employment of a full-time person to be available to answer daytime calls. This would be a 40–hour a week position over five days with serving the other four hours a day covered on a voluntary basis. Schedules will be worked out to cover weekends, holidays and vacations.

After conferring with council members, the following job description was agreed upon:

> A valid EMT Certificate must be maintained, must be available to respond to all calls while on duty for 8 hours a day, five days a week. This person will be available to cover the other four hours a day on a voluntary basis. Be available to the city for general labor at all other times.

*Affidavit of Sharon Bunker, fka Brekke, Exhibit 6.*

As a beginning salary for this position, the Plaintiff was to receive "$5.00 an hour for general labor,[4] [and] $7.00 an hour when on ambulance calls." *Id.* The Plaintiff's hourly wage was periodically increased during her employment as the Ambulance Director and, at the time that the Ambulance Service was closed, she was being compensated at a rate of $10.37 an hour.[5]

The Plaintiff retained the position of Ambulance Director until April 18, 1995, when the City Council voted to discontinue the Ambulance Service. From its inception, her position required that she serve as the Ambulance Service's primary EMT, and that she coordinate the scheduling of the staff of volunteers. Due to the frequent turnover in the roster of volunteers, the number of available volunteers tended to fluctuate, from a figure as low as eight, to as many as fifteen. In addition, as an apparent condition for State licensing, each volunteer was required to hold a valid State EMT certification. As a result, during the period from 1985 to 1993, in order to assure an adequate staff of volunteers, the Plaintiff would conduct annual EMT initial training courses and, occasionally, supplemental "refresher" courses. Since these courses required an additional expenditure of City funds, the Plaintiff originally sought the City Council's approval prior to conducting a new class but, on July 18, 1989, the City Council passed a resolution which allowed the Plaintiff to conduct the classes without pre-authorization, so long as she kept the City Council "informed as to the classes." *Affidavit of Susan McKay, Exhibit 4.*

As we have noted, on her regular work days, the Plaintiff was required to "volunteer" so as to cover, on an on-call basis, an additional four hours which, apparently, included the two-hour periods that immediately preceded, and directly followed, her scheduled shift. Furthermore, because of difficulties in obtaining volunteer coverage for certain of the weekend and holiday shifts, the Plaintiff was frequently called upon to "volunteer" in order to cover these shifts as well. As was the case with the other volunteers, while on-call, the Plaintiff was required to wear a paging device, which emitted an audible signal which would alert her to an emergent request for ambulance service. To facilitate a prompt response to such a request, while on-call, the Ambulance Service personnel were required to remain within a certain geographic radius of the Ambulance Service'

---

throughout this Order, when referring to this position.

3. At all times which are relevant to this action, the Blackduck Ambulance Association (the "Ambulance Association"), was an informal body, which was comprised of the volunteers who, as noted, made up the bulk of the staff of the Ambulance Service. The Record indicates that the Ambulance Association exercised no supervisory control over the Plaintiff, and that it was not vested with any decision-making authority for the Ambulance Service, but rather, existed only in an advisory capacity.

4. The Record reveals that the Plaintiff's actual starting wage, for the "general labor" aspect of *her* position, was $4.50 per hour, but this rate of pay was raised to $5.00 per hour upon her successful completion of her initial six-month probationary period of employment.

5. Throughout her period of employment as the Ambulance Director, the Plaintiff was paid less than certain other City employees, each of whom was male. In particular, she was paid less than Wayne Ward ("Ward"), who was the City's Liquor Store manager, and Robert Klug ("Klug"), who served as a maintenance supervisor.

garage. At the commencement of the Plaintiff's employment as the Ambulance Director, this radius was limited to two miles but, later, the radius was increased to three, and then five miles. Ultimately, for the final year of the Ambulance Service's operation, the area was increased to a radius of ten miles from the garage. On-call personnel were not required to respond to a page within a set period of time and, aside from the geographic restriction, the only limitation that the on-call status placed upon the volunteer's personal activities, was that they could not become intoxicated during their shifts.

As a consequence of the on-call component to her job description, the Plaintiff frequently worked more than 40 hours in a week's period. On June 20, 1989, the Plaintiff informed the City Council that, since the date of her hire, and continuing through to that time, she had amassed a significant number of work hours, which exceeded 40 hours per work week, and which had not been compensated at overtime rates. When she requested reimbursement for the lost overtime pay, the City Council opted to pay her a lump sum which represented $7.00—the volunteer wage—for each hour of accumulated "overtime." Notwithstanding this lump sum payment, for the remainder of the Ambulance Service's existence, the Plaintiff was often compelled to work more than 40 hours a week, as a result of the Ambulance Service's continuing staffing problems. The City attempted to rectify this problem through a variety of means. At first, the Plaintiff was instructed to take "compensatory time" in lieu of overtime pay.[6] This solution proved unworkable, however, because the Plaintiff was unable to use her compensatory time, as she could not locate volunteers who were willing to cover her regular daytime shifts. At other times, she was paid the volunteer rate of $7.00 per hour, for those portions of her on-call shifts when she was involved in actual ambulance runs and, on other occasions, she was instructed not to schedule herself for any hours—volunteer or otherwise—which would exceed a regular 40 hour work week.[7] Despite these measures, the issue of compensation, for the Plaintiff's excess hours, was never resolved to the parties' mutual satisfaction.

The Record reflects that, as early as February of 1992, the City Council became sufficiently concerned with the operations of the Ambulance Service that it considered several means by which the Service could be "revamped" or "reorganized." *Affidavit of Susan McKay, Exhibits 9 and 11.* Among the measures considered at that time was the possible sale of the Ambulance Service to a private party. In addition, the City Council debated the feasibility of creating a committee, or some similar entity, to oversee the performance of the Ambulance Service. For most of the period in which she had served as the Ambulance Director, the Plaintiff reported directly to the City Council. On July 20, 1993, however, at the suggestion of Vernon Beighley ("Beighley"), an Ambulance Service volunteer and a member of the Ambulance Association, the City Council established the Ambulance Executive Board ("Executive Board"), "for the purpose of governing the [A]mbulance [S]ervice." *Affidavit of Sharon Bunker, fka Brekke, Exhibit 6.* Thereafter, the Executive Board—which was comprised of six members, inclusive of both Beighley and the Plaintiff—had direct supervisory authority over the Ambulance Service and, as a consequence, the Plaintiff reported directly to the Executive Board, rather than to the City Council. As a result of this new supervisory regime, the Plaintiff was required to obtain the approval of the Executive Board before she could teach any new EMT volunteer training courses. In early 1994, the Plaintiff sought the Executive Board's permission to begin instructing new volunteers, but the Executive Board and, later, the City Council, chose not to authorize the proposed training sessions, and the Plaintiff did not instruct any new volunteers after 1993.

In June of 1993, at approximately the same time as the formation of the Executive

---

6. "Compensatory time," or "compensatory time off," is defined as "paid time off the job which is earned and accrued by an employee in lieu of immediate cash payment for employment in excess of [40 hours per week]." *29 C.F.R. § 553.22(a).*

7. In May of 1994, the Plaintiff's job description was revised to eliminate the "volunteer" requirement altogether. See, *Affidavit of Sharon Bunker, fka Brekke, Exhibit 7.* The Record is unclear as to whether this revision actually resulted in the elimination of the Plaintiff's on-call responsibilities.

Board, the Plaintiff's job description was expanded to include a series of new duties, which chiefly involved billing, accounting, and record keeping. Consistent with her earlier job description—which required that she perform "general labor"—this new job description reflected that, "[a]fter fulfilling the job responsibilities of the [Ambulance Director]," the Plaintiff was to make herself "available to the City of Blackduck for miscellaneous job responsibilities." *Affidavit of Sharon Bunker, fka Brekke, Exhibit 8.* Consistent with this express job requirement, the Plaintiff made herself available to perform general municipal maintenance duties, such as cleaning the City park. The Plaintiff attests, however, that, on January 4, 1994, when she reported for work at the City maintenance garage, Bob Klug ("Klug"), the City's Maintenance Supervisor, instructed her to leave, with the following commentary:

> You're making my guys look bad. You're always seen working, and I don't want you working here. They're talking about laying off one of my men, and I will not have you working here and lose one of my men. So I don't want you to work here anymore because you're making my guys look bad.

*Deposition of Sharon Brekke–Bunker,* at 78.[8] Following this incident, the Executive Board revised the Plaintiff's job description, on May 17, 1994, so as to eliminate her "general labor/miscellaneous job responsibilities."

In 1993, rumors began to circulate that the Plaintiff had become romantically involved with Richard Bunker ("Bunker"), who was then a City maintenance worker. Apparently, in early 1994, the two were seen riding together in a City maintenance vehicle and, as a result, at an Executive Board meeting of May 9, 1994, Deb Eibensteiner ("Eibensteiner"), who was a City Council member and a member of the Executive Board, instructed the Plaintiff that since she was no longer performing "general labor" for the City, she "was not to be seen in any of the city vehicles." *Affidavit of Sharon Bunker, fka*

*Brekke, Exhibit 23.* Before this time, the Plaintiff had used City vehicles when running job errands, such as having the City's ambulance serviced but, thereafter, she was not allowed to make use of the City's vehicles, even during inclement weather.

On July 17, 1994, the Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination on the basis of gender, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), and the Minnesota Human Rights Act ("MHRA"). See, *Title 42 U.S.S. § 2000e–1, et seq.; Minnesota Statutes Section 363.01, et seq.* The Plaintiff contends that, after she filed this charge, her relationships with the City Council, and with the Executive Board, became markedly hostile. On September 20, 1994, at a City Council meeting which was open to the public, Council members read aloud a letter from a member of the public that raised serious allegations—which were later determined to be without foundation—concerning the Plaintiff's professionalism and competence. After the letter was read, and upon the Motion of Eibensteiner, the letter was placed in the Plaintiff's personal file.[9]

Although the Plaintiff was present at this meeting, she was not given notice of the contents of the letter before it was publicly recited at the meeting. At this same meeting, a letter was also read which was critical of the performance of a City police officer. However, the issues generated by this other letter were "tabled" until the officer could be afforded an opportunity to respond to the letter's charges. The Record does not indicate whether the City Council considered placing the letter in the officer's personnel file. *Affidavit of Sharon Bunker, fka Brekke, Exhibit 23.* Although the Plaintiff remained a member of the Executive Board, she avers that, after she filed her EEOC discrimination charge, the Executive Board began scheduling meetings without informing her, and conducted meetings without her participation. *Affidavit of Sharon Bunker,*

---

8. We understand that the Defendant disputes the Plaintiff's assertion that Klug made these remarks but, for these purposes, we must accept the truth of the Plaintiff's recounting of this event, since she is the non-moving party to a dispositive Motion.

9. The letter was subsequently removed from the Plaintiff's personnel records after it was determined that the letter's allegations could not be supported.

*fka Brekke,* at ¶ 5. In addition, on August 29, 1994, Beighley and Jim VandeKamp—both of whom were members of the Executive Board—called a meeting of the Ambulance Association, for which no minutes were kept, and from which the Plaintiff was excluded. *Affidavit of Susan Potts, Exhibit 1,* and ¶ 2. At this meeting, Beighley encouraged his daughter Kami, who was also a volunteer, to recount a then recent on-the-job experience, which she had shared with the Plaintiff, and which seriously impugned the Plaintiff's professional capacities.[10] *Affidavit of Susan* Potts, at ¶ 2; *Affidavit of Bridget McNeil,* at 14. At this same meeting, Beighley encouraged other members of the Ambulance Association to relay to State authorities any incidents which could question the Plaintiff's professional qualifications. In requesting such correspondence, Beighley stated that the City "needed something to fight [the Plaintiff's EEOC charge] with * * *." *Affidavit of Susan Potts,* at ¶ 2. In December of 1994, the Plaintiff filed a second charge with the EEOC, this time alleging acts of reprisal in response to her first charge.

In the latter part of 1994, the Ambulance Service, which was already understaffed with volunteers, suffered several additional resignations, including those of Beighley, his daughter Kami, and his sister. As a result, the Ambulance Service's staffing problems became quite acute.[11] This shortage was partially ameliorated by having Bunker cover some of the on-call shifts, but Klug, who was Bunker's supervisor, opposed this practice because it left the City maintenance department potentially short-handed. The Record reflects that the Plaintiff suggested that these staffing problems could be redressed if the Executive Board and City Council would allow her to train new volunteers. The City Council, however, would not authorize the needed training. Instead, in January of 1995, the City Council began to explore the option of discontinuing the Ambulance Service, and of leasing its equipment to the Ambulance Association, which would be reorganized, in a corporate form, to provide the community with ambulance services. Eventually, these plans were realized and, on April 18, 1995, the City Council abolished the Ambulance Service by formal resolution.[12] In terminating the Ambulance Service, the City Council advised that it had "weighed the need against the continued cost of operating [the Ambulance Service] both financially and in terms of personnel[,]" and had determined that the City's needs could best be served by a contract with the new ambulance corporation. *Defendant's Motion for Summary Judgment, Exhibit B.* In addition, the City Council simultaneously passed a resolution which abolished the position of Ambulance Director since, with the closing of the Ambulance Service, the City had no further need to fill that position. *Id.* Finally, the City Council resolved to end the Plaintiff's employment with the City, because her present position had been abolished, and "the City of Blackduck ha[d] no other position of employment for which [the Plaintiff] [wa]s qualified o[r] needed." *Id.*

### III. *Discussion*

On August 4, 1995, the Plaintiff commenced this action with the filing of a Complaint, in which she alleges that the Defen-

---

**10.** This incident involved an elderly woman, who was discovered by the Plaintiff, and by other members of the Ambulance Service, in a comatose state. The woman died shortly after she was brought to the hospital. The accuracy of Kami Beighley's recounting of this incident was disputed, both by the Plaintiff, and by other City workers who witnessed the recounted events. *Affidavit of Sharon Bunker, fka Brekke, Exhibit 28.*

**11.** The Plaintiff has asserted that the Ambulance Service was required to maintain a minimum of five volunteers on its roster, so as to maintain a State license. While the Record is not altogether clear on this point, it appears that, as a result of the abovementioned resignations, the Ambulance Service was operating with between 6 to 8 volunteers.

**12.** Upon the discontinuation of the Ambulance Service, a private entity, which has been denominated as the Blackduck Ambulance Association, Inc., was formed as the Service's successor. This corporation leased its building and equipment from the City, and the City also provided it with substantial start-up financial assistance, including loan financing for a new ambulance. As a fail-safe measure, on April 18, 1995—the date on which the Ambulance Service was discontinued—the City voted to establish and retain a separate fund "to be used in the event that the newly formed ambulance corporation fails and the city would again have to assume the administration [of ambulance service] ...." *Affidavit of Susan McKay, Exhibit 21.*

dant has violated the Fair Labor Standards Act of 1938 ("FLSA"), by refusing to pay her overtime compensation for the work she performed in excess of 40 hours per week. See, *Title 29 U.S.C. § 201 et seq.* She also alleges that the Defendant engaged in illegal discrimination and reprisal, in violation of both Title VII, and the MHRA. In a related claim, the Plaintiff alleges that the Defendant has practiced impermissible gender-based wage discrimination, in violation of Minnesota Statutes Section 181.67. Further, the Plaintiff has instituted a claim under Title 42 U.S.C. § 1983, by which she accuses the Defendant of violating several of her constitutional rights—specifically, her right to procedural and substantive due process of law, and to petition for redress of grievances. Lastly, the Plaintiff has asserted State law claims for defamation, for violations of the Minnesota Government Data Practices Act, see *Minnesota Statutes Sections 13.01 et seq.,* and for violating the State's Open Meeting Law. See, *Minnesota Statutes Section 471.795.*

Responding to the Plaintiff's Complaint, the Defendant has filed the Motion for Summary Judgment which is presently before the Court, and in which it argues that each of the Plaintiff's Federal claims is untenable, as a matter of law. In addition, the Defendant seeks Summary Judgment on the Plaintiff's claims under the MHRA, and under Section 181.67. Alternatively, the Defendant urges that, if we should grant Summary Judgment on the Plaintiff's Federal claims, then we should decline to exercise supplemental jurisdiction over her remaining State law claims. See, Title 28 U.S.C. § 1367(c)(3).[13]

13. We briefly summarize our Standard of Review by noting that Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence and in rendering credibility determinations.. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554–55, 91 L.Ed.2d 265 (1986). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in.a light most favorable to the non-moving party, and find no triable issue, or any genuine issue of material fact which would preclude the entry of Summary Judgment. *Lower Brule Sioux Tribe v. State of South Dakota,* 104 F.3d 1017, 1021 (8th Cir.1997); *Andrews v. Fowler,* 98 F.3d 1069, 1074 (8th Cir.1996); *Bank of America National v. Shirley,* 96 F.3d 1108, 1111 (8th Cir.1996); *Kiemele v. Soo Line Railroad Co.,* 93 F.3d 472, 474 (8th Cir.1996). For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a verdict for the non-moving party. See, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Landon v. Northwest Airlines, Inc.,* 72 F.3d 620, 624 (8th Cir.1995); *Churchill Business Credit Inc. v. Pacific Mutual Door Co.,* 49 F.3d 1334, 1336 (8th Cir.1995).

As Rule 56(e), *Federal Rules of Civil Procedure,* makes clear, once the moving party files a properly supported Motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. In sustaining that burden, an "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial." *Rule 56(e), Federal Rules of Civil Procedure;* see also, *Lower Brule Sioux Tribe v. State of South Dakota,* supra at 1021; *Davis v. Fulton County, Arkansas,* 90 F.3d 1346, 1350 (8th Cir.1996); *Roxas v. Presentation College,* 90 F.3d 310, 315 (8th Cir.1996); *Ferguson v. Cape Girardeau County,* 88 F.3d 647, 650 (8th Cir.1996); *Barge v. Anheuser–Busch, Inc.,* 87 F.3d 256, 258 (8th Cir.1996).

Moreover, a defendant is entitled to Summary Judgment where a plaintiff has failed "to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial." *Celotex Corp. v. Catrett, supra* at 322, 106 S.Ct. at 2552; *St. Paul Fire & Marine Ins. Co. v. Federal Deposit Ins. Corp.,* 968 F.2d 695, 699 (8th Cir.1992). No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of [the Plaintiff's] case necessarily renders all other facts immaterial." *Id.,* at 323, 106 S.Ct. at 2552; *Fischer v. NWA, Inc.,* 883 F.2d 594, 599 (8th Cir.1989), cert. denied, 495 U.S. 947, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990).

Lastly, "[b]ecause [employment] discrimination cases often turn on inferences rather than on direct evidence, [Courts] are particularly deferential to the non-moving party alleging discrimination." *Webb v. Garelick Mfg. Co.,* 94 F.3d 484, 486 (8th Cir.1996); see also, *Davis v. Fleming Companies,* 55 F.3d 1369, 1371 (8th Cir.1995); *Oldham v. West,* 47 F.3d 985, 988 (8th Cir.1995); *Hardin v. Hussmann Corp.,* 45 F.3d 262, 264 (8th Cir.1995); *Gill v. Reorganized School Dist. R–6, Festus, Missouri,* 32 F.3d 376, 378 (8th Cir. 1994). Nevertheless, while "summary judgment should seldom be granted in employment discrimination cases, if [the Plaintiff] fails to establish a factual dispute on each element of the prima facie case, summary judgment is appropriate." *Bialas v. Greyhound Lines, Inc.,* 59 F.3d 759, 762 (8th Cir.1995), quoting *Weber v. American Express Co.,* 994 F.2d 513, 515–16 (8th Cir.

### A. *The Plaintiff's FLSA Claims.*

1. *Standard of Review.* Under the FLSA, employees are entitled to additional compensation for working more than 40 hours in one week. See, Title 29 U.S.C. § 207(a). While the Act provides for certain exemptions to the overtime requirement, these are " 'narrowly construed in order to further Congress' goal of providing broad federal employment protection." *Spinden v. GS Roofing Products Co., Inc.,* 94 F.3d 421, 426 (8th Cir.1996), cert. denied, —— U.S. ——, 117 S.Ct. 1254, 137 L.Ed.2d 334, 1997 WL 49713 (1997), quoting *McDonnell v. City of Omaha,* Neb., 999 F.2d 293, 295 (8th Cir. 1993), cert. denied, 510 U.S. 1163, 114 S.Ct. 1188, 127 L.Ed.2d 538 (1994). For this reason, "[t]he burden is on the employer to prove that [an] exemption applies by 'demonstrat[ing] that their employees fit plainly and unmistakably within the exemption's terms and spirit.' " *Spinden v. GS Roofing Products Co. Inc.,* supra at 426, quoting *McDonnell v. City of Omaha, Neb.,* supra at 296. Furthermore, "[t]he employer's obligation to pay premium overtime compensation, whatever the regular rate of pay, is statutory and cannot be waived or substituted by an agreement to work for less." *Mumbower v. Callicott,* 526 F.2d 1183, 1188 (8th Cir.1975).

Moreover, it is well-settled that "[t]ime spent away from an employer's premises may constitute compensable hours of work if conditions imposed by an employer restrict the employee from using the time for personal pursuits." *Cross v. Arkansas Forestry Com'n,* 938 F.2d 912, 916 (8th Cir.1991). While there is no "legal formula to resolve cases so varied in their facus[,]" *Skidmore v. Swift & Co.,* 323 U.S. 134, 136, 65 S.Ct. 161, 163, 89 L.Ed. 124 (1944), the relevant inquiry focuses upon whether the on-call time "is spent predominantly for the employer's benefit or for the employee's." *Armour & Co. v. Wantock,* 323 U.S. 126, 133, 65 S.Ct. 165, 168, 89 L.Ed. 118 (1944). Stated somewhat more artfully, "[f]acts may show that the employee was engaged to wait, or they may show that he waited to be engaged." *Skidmore v. Swift & Co.,* supra at 137, 65 S.Ct. at 163.

■ 2. *Legal Analysis.* As a threshold observation, it appears that the Defendant has misapprehended the full measure of the Plaintiff's FLSA claim. In moving for Summary Judgment, the Defendant has characterized this claim as one in which the Plaintiff maintains "that she is entitled to overtime compensation from 1985 to the present for all time she spent 'on-call' for the Ambulance Service and for that time which she served as a volunteer for the Service." *Defendant's Memorandum,* at 25. This characterization, however, unduly restricts the full magnitude of the Plaintiff's FLSA claim. As we understand it, the claim has two aspects. First, as the Defendant correctly observes, the Plaintiff alleges that the Defendant violated the FLSA, by failing to pay her overtime compensation for those hours in which she served on-call. Second, she alleges that the Defendant violated the FLSA by failing to pay her overtime compensation for those occasions on which she actually "worked" more than 40 hours in a given week.[14] In its Motion for Summary Judgment, the Defendant has failed to address the latter aspect of this claim.[15]

---

1993); see also, *Wilson v. International Business Machines,* 62 F.3d 237, 240 (8th Cir.1995).

**14.** Our understanding of the full breadth of the Plaintiff's FLSA claim is corroborated by the following colloquy, which occurred during the taking of her deposition:

Q. So all of the overtime that you're talking about is your on-call time?
MS. McKAY: (Indicating no.)
BY MR. MINTON:
Q. Your attorney is shaking her head no.
MS. McKAY: No, because, if I may interject, she was not paid her regular hourly rate when she was required to volunteer and when she made runs. So it's more than just the on-call time. When she made runs, she was only paid what the volunteers were paid.

MR. MINTON:
Q: You were paid what the volunteers got paid, but not your regular rate?
MS. McKAY: The time and a half, yes.
*Deposition of Sharon Brekke–Bunker,* at 149–50.

**15.** The Defendant also argues that the FLSA's two-year statute of limitations, see, *Title 29 U.S.C. § 255(a),* operates to defeat much of the Plaintiff's FLSA claim. A statute of limitations, however, presents an affirmative defense, and one which the Defendant did not raise in its Answer to the Plaintiff's Complaint, and no Motion to expand its defenses has been made. Accordingly, at least for these purposes, the Defendant has waived any benefit which might have accrued to it, by this limitations defense. See, *Rule 8(c), Federal Rules of Civil Procedure; see*

In this respect, the FLSA specifically mandates that a State or local Government employee should either be paid overtime for periods worked in excess of 40 hours per week, or else receive "compensatory time off at a rate not less than one and one-half hours for each hour of employment for which overtime compensation is required * * *." *Title 29 U.S.C. § 207(o)*.[16] Here, the Plaintiff has offered evidence to suggest that, during her period of employment as the Ambulance Director, she worked a substantial number of hours in excess of 40 hours per week, for which she was neither paid overtime compensation, nor allowed to take compensatory time in lieu of overtime. The extent of this apparently undercompensated time is not calculable from the present state of the Record, but this uncertainty merely underscores the existence of genuine and material factual disputes which preclude a grant of Summary Judgment on this aspect of the Plaintiff's FLSA claim.

We do conclude, however, that the Defendant is entitled to a grant of Summary Judgment on the Plaintiff's claim that she should be paid overtime for those hours that she had served "on-call." In this respect, we note that, in the vast majority of reported cases dealing with on-call time, the hours were held noncompensable under the FLSA. See, e.g., *Berry v. County of Sonoma*, 30 F.3d 1174 (9th Cir.1994) (coroners not entitled to compensation for on-call time despite the fact that they were on call 24 hours a day, were required to respond to pages within 15 minutes, and received three to six calls per day), *cert. denied*, 513 U.S. 1150, 115 S.Ct. 1100, 130 L.Ed.2d 1067 (1995); *Gilligan v. City of Emporia, Kansas*, 986 F.2d 410 (10th Cir. 1993) (sewer department employees not entitled to compensation for on-call time, although required to wear a pager, to participate in nothing that might prevent them from hearing the pager, to avoid alcohol, to

respond within 30–60 minutes to a call, and to be subject to discipline for a failure to satisfy these requirements); *Armitage v. City of Emporia, Kansas*, 982 F.2d 430 (10th Cir.1992) (police detectives not entitled to on-call compensation despite requirements that they remain sober and wear pager while on call, that they respond to calls within 20 minutes, and that they were actually called to work one to two times per week); *Bright v. Houston Northwest Med. Ctr. Survivor, Inc.*, 934 F.2d 671 (5th Cir.1991) (affirming grant of summary judgment despite the fact that employee was *always* on call, was required to carry a pager at all times, could not become intoxicated, and was required to respond within 20–25 minutes, day or night), cert. denied, 502 U.S. 1036, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992); see also, *Owens v. Local No. 169*, 971 F.2d 347 (9th Cir.1992); *Martin v. Ohio Turnpike Com'n*, 968 F.2d 606 (6th Cir.1992), cert. denied, 506 U.S. 1054, 113 S.Ct. 979, 122 L.Ed.2d 133 (1993); *Boehm v. Kansas City Power & Light Co.*, 868 F.2d 1182 (10th Cir.1989); *Halferty v. Pulse Drug Co.*, 864 F.2d 1185 (5th Cir.1989); *Kelly v. Hines–Rinaldi Funeral Home, Inc.*, 847 F.2d 147 (4th Cir.1988), cert. denied, 493 U.S. 835, 110 S.Ct. 112, 107 L.Ed.2d 74 (1989); *Norton v. Worthen Van Service, Inc.*, 839 F.2d 653 (10th Cir.1988); *Rousseau v. Teledyne Movible Offshore, Inc.*, 805 F.2d 1245 (5th Cir.1986), cert. denied, 484 U.S. 827, 108 S.Ct. 95, 98 L.Ed.2d 56 (1987); *Darrah v. Missouri Highway and Transp. Com'n*, 885 F.Supp. 1307 (W.D.Mo.1995); *Burnison v. Memorial Hospital, Inc.*, 820 F.Supp. 549 (D.Kan.1993); *Pilkenton v. Appalachian Regional Hospitals, Inc.* 336 F.Supp. 334 (W.D.Va.1971).

Thus, the general rule is that "although *every* on-call policy creates some imposition on the life of the employee subject to the terms thereof, such time will nonetheless

---

also, *Mumbower v. Callicott*, 526 F.2d 1183, 1187 n. 5 (8th Cir.1975) ("Moreover, 29 U.S.C. § 255(a) was intended to serve as a conventional limitation on the remedy, not upon the right to bring the action, and must be pleaded as an affirmative defense in compliance with Fed. R.Civ.P. 8(c)"), citing *Hodgson v. Humphries*, 454 F.2d 1279, 1283–84 (10th Cir.1972); *Professional Firefighters v. City of Clayton*, 759 F.Supp. 1408, 1415 (E.D.Mo.1991) (City's failure to plead or

otherwise assert FLSA statute of limitations defense, prior trial, resulted in its waiver).

**16.** Furthermore, a public employer cannot escape its obligation, to pay overtime to its employees, by having the employees "volunteer" to perform duties which are encompassed in their ordinary job responsibilities. See, *Title 29 U.S.C. § 203(e)(4)(A)*; see also, *Evers v. Tart*, 48 F.3d 319, 320 (8th Cir.1995).

rarely be compensable." *Darrah v. Missouri Highway and Transp. Com'n,* supra at 1311. Moreover, those cases which have departed from this general rule demonstrate the exceptional circumstances which must obtain for on-call time to be compensable under the FLSA. First, in *Renfro v. City of Emporia, Kansas,* 948 F.2d 1529 (10th Cir.1991), cert. dismissed, 503 U.S. 915, 112 S.Ct. 1310, 117 L.Ed.2d 510 (1992), the plaintiffs were firefighters who were scheduled for six 24–hour shifts within every 19–day period. After the completion of each of these shifts, they were required to remain on-call for an additional 24 hours. While the firefighters were not required to remain in the firehouse during the on-call periods, they had to be able to respond to a call within 20 minutes and, most notably, while on-call, the firefighters received as many as 13 calls in a shift, with an average of four to five calls per shift. *Id.* at 1532. According to the Court, "the frequency with which the firefighters were subject to callbacks distinguished this case from other cases which have held on-call time as noncompensable." *Id.* at 1532–33. Under these onerous circumstances, the Court concluded that the District Court had reasonably determined that the firefighters were "engaged to wait" and, therefore, that they were eligible for compensation under the FLSA. *Id.* at 1534–35.

The other exceptional case was decided by our Court of Appeals, see, *Cross v. Arkansas Forestry Com'n,* supra, and the decision contains the Court's only pronouncement on this issue. In *Cross,* the plaintiff employees were State forest workers who, during their work periods, were "subject-to-call" 24 hours per day, and seven days a week, in the case of a fire emergency. When subject-to-call, the Plaintiffs were provided with hand-held radios, and they were required to monitor the traffic of these radios at all times and, indeed, they had even trained themselves to monitor the radio traffic while sleeping. *Id.* at 914 and n. 4. In the event of an emergency radio call, the firefighters were required to respond within 30 minutes, or face discipline. *Id.*

Because of these extraordinary constraints, the Court concluded that a reasonable juror could find that the employees were "engaged to wait" and, accordingly, it re-versed the District Court's grant of Summary Judgment in the employer's favor. *Id.* at 917. In so doing, the Court noted the factors which, in its view, distinguished the case from those in which Summary Judgment would have been proper. In the words of the Court:

> [T]he facts of this case are unlike typical "on-call" cases in two respects. The Commission requires the employees to monitor radio transmissions continuously during the work week, rather than contacting them exclusively by telephone or electronic pager. * * * Because the radio must be on at all times, the employees' ability to entertain in their homes, attend social gatherings, attend church services or engage in other personal pursuits is limited. The employees' ability to enjoy common activities such as watching television or reading is also decreased because they must devote attention to radio transmissions. Additionally, instead of being placed "on-call" for a defined number of hours during a work period, the Commission's policy places the employees on subject-to-call status twenty-four hours per day every day of a work period, unless a supervisor agrees to—substitute for a period of time. * * * Thus, the employees do not receive a respite during the work period from the subject-to-call requirement.

*Id.* [citations and footnote omitted]

Accordingly, the features which distinguished *Cross* from those cases, in which on-call time was found to be noncompensable, were first, that the employees were not "merely waiting to be engaged," but were "actually required to do an affirmative act while waiting—listen to the radio for emergency transmissions." *Darrah v. Missouri Highway and Transp. Com'n,* supra at 1312. Second, the employees were on-call 24 hours a day, without respite. *Id.*

Here, unlike the employees in *Cross,* the Plaintiff was not required to perform any affirmative acts while on call but, instead, she only was required to wear her pager, to remain within the prescribed radius of the Ambulance Service's garage, and to maintain sobriety. Although the Plaintiff argues that this on-call status interfered with certain ac-

tivities, such as shopping, vacuuming, going for long walks, or baking, the fact remains that she was substantially at liberty to engage in any number of activities while wearing her pager, provided that her participation did not hinder her ability to hear the pager, in the event that it should activate. Thus, unlike the employees in *Cross*, while on-call, the Plaintiff was able to socialize, attend church services, read, watch television, and participate in similar activities.

Furthermore, unlike the employees in *Cross*, the Plaintiff was not required to remain on call for 24 hours a day without respite. Instead, her on-call hours were confined to four hours each work day, with some weekend and holiday shifts. Lastly, unlike the firefighters in *Renfro*, while on-call, the Plaintiff was not actually called with any frequency and, in fact, the Plaintiff has acknowledged that the Ambulance Service, as a whole, only received an average of five calls per week. *Deposition of Sharon Brekke-Bunker*, at 154.

Of course, we do not suggest that the on-call periods had no effect upon the Plaintiff's use of her personal time, for this is inevitably the case whenever an employee is subject to emergency on-call status. See, e.g., *Bright v. Houston Northwest Med. Ctr. Survivor, Inc.*, supra at 677; *Darrah v. Missouri Highway and Transp. Com'n*, supra at 1313. Nevertheless, "every case that has addressed this issue tells us that without some significant additional restriction on the employee's off-duty time, such that the time can be said to have been spent primarily for the employer's benefit, the time will not be compensable." *Darrah v. Missouri Highway and Transp. Com'n*, supra. Here, the Plaintiff has not drawn our attention to the existence of any significant additional restrictions, such that her on-call time could be fairly styled as time spent "engaged to wait," rather than "waiting to be engaged" and, therefore, we conclude that the evidence, which has been presented, is insufficient to permit a reasonable factfin-

der to find that the Defendant's on-call policy violated the FLSA. Accordingly, we grant the Defendant's Motion for Summary Judgment, on the sole issue of the general compensability of the Plaintiff's on-call hours. In all other respects, this aspect of the Motion for Summary Judgment is denied.

**B.** *The Plaintiff's Claims under Title VII, the MHRA, and the Minnesota Statutes Section 181.67.*

**1.** *Standards of Review.*

**a.** *The Plaintiff's Gender Discrimination Claims.*

Both Title VII, and the MHRA, prohibit employers from discriminating against their employees on the basis of gender. See, Title 42 U.S.C. § 2000e–2(a); Minnesota Statutes Section 363.03, subd. 1(2). An employee, such as the Plaintiff, who alleges disparate treatment in her employment, may rely upon either direct or circumstantial evidence in order to sustain her claim. See, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) (establishing the framework for pretext cases that involve circumstantial evidence); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244–46, 109 S.Ct. 1775, 1787–88, 104 L.Ed.2d 268 (1989) (establishing the framework for mixed-motive cases that involve direct evidence).

A mixed-motives analysis is required "when an employment decision was 'the product of a mixture of legitimate and illegitimate motives.'" [17] *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 448 (8th Cir.1993), quoting *Price Waterhouse v. Hopkins*, supra. In a mixed motive case, "the plaintiff carries the initial burden of 'showing that an illegitimate criterion was a motivating factor in the employer's decision to terminate her employment.'" *Philipp v. ANR Freight System, Inc.*, 61 F.3d 669, 673 (8th Cir.1995), quoting

**17.** Under Minnesota employment law, both "single motive" and "mixed motive" claims of disparate treatment are analyzed under the *McDonnell–Douglas* test. *Anderson v. Hunter, Keith, Marshall & Co.*, 417 N.W.2d 619, 626–27 (Minn. 1988); *McGrath v. TCF Bank Savings*, 502 N.W.2d 801, 806 (Minn.App.1993), aff'd. as modified, 509 N.W.2d 365 (Minn.1993); see also,

*LeBlond v. Greenball Corp.*, 942 F.Supp. 1210, 1216 n. 2 (Minn.1996). Since the Minnesota approach would not produce a different result from that which we have reached, we only note the distinction, and we address the issue in the context of the mixed motive precedents of this Circuit.

*Cram v. Lamson & Sessions Co.*, 49 F.3d 466, 471 (8th Cir.1995). Once the Plaintiff has made this threshold showing, "the burden of persuasion then shifts to the employer to prove that it would have terminated the employee even without the illegitimate criterion." Id.

■ In making this threshold showing, the plaintiff must present evidence which demonstrates "a specific link between the discriminatory animus and the challenged decision sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the challenged decision."[18] Id., quoting *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 996 F.2d 200, 201 n. 1 (8th Cir.1993). "This requirement of a causal link between discriminatory statements and the decisional process therefore renders insufficient 'stray remarks in the workplace', 'statements by non-decisionmakers', or 'statements by decisionmakers unrelated to the decisional process itself.'" Id., quoting *Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir.1991), in turn quoting *Price Waterhouse v. Hopkins*, supra at 277, 109 S.Ct. at 1804 (O'Connor, J., concurring). Thus, "actions and comments by employees not involved in a discharge decision cannot provide a basis for charging other employees with discrimination." *Hermeling v. Montgomery Ward & Co., Inc.*, 851 F.Supp. 1369, 1378 (D.Minn.1994), quoting *Price Waterhouse v. Hopkins*, supra.

In contrast, the premise of a pretext case "is that *either* a legitimate or illegitimate set of considerations led to the challenged decision." *Radabaugh v. Zip Feed Mills, Inc.*, supra at 448 [emphasis in original], quoting *Price Waterhouse v. Hopkins*, supra at 247,

109 S.Ct. at 1788–89. Under the *McDonnell Douglas* framework, "the plaintiff creates an inference of intentional discrimination by establishing the so-called *prima facie* case." *Hutson v. McDonnell Douglas*, 63 F.3d 771, 776 (8th Cir.1995). "While its elements will vary depending on the circumstances of the case, the fundamental purpose of the *prima facie* case is to require the plaintiff to show: (1) that an adverse employment action occurred, and (2) that the most common explanations for an adverse employment action, such as incompetence, are not applicable." Id. Generally, in presenting a *prima facie* case of discrimination, the plaintiff must demonstrate that she is a member of a protected class, that she meets the minimum qualifications for the position, and that she suffered some form of adverse employment decision.[19]

■ Once the plaintiff has made that *prima facie* showing, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for its challenged decision. *McDonnell Douglas Corp. v. Green*, supra at 802, 93 S.Ct. at 1824; *Texas Department of Comm. Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981); *Hutson v. McDonnell Douglas Corp.*, supra ("Once established, the *prima facie* case entitles the plaintiff to a rebuttable presumption that intentional discrimination played a role in the adverse employment action"). If the employer provides such a reason, then "the burden shifts back to the plaintiff to demonstrate that the reason provided was a pretext for discrimination." Id. at 777. However, should the employer be unable to provide such a reason for

---

18. Ordinarily, a mixed motive analysis is implicated where the employee presents "direct evidence" of unlawful discrimination. *Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir.1991). Although denominated "direct evidence," in *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 996 F.2d 200, 201 n. 1 (8th Cir.1993), our Court of Appeals observed that, in a strict hornbook sense, the evidence necessary to shift the burden of persuasion under the *Price Waterhouse* doctrine requires an inferential step from the statement itself to the conclusion that a discriminatory motive played a role in the pertinent employment decision. Thus, the use of the term "direct evidence" may be more properly classified as evidence that is, in practical effect, circumstantial

in nature. See, *Braziel v. Loram Maintenance of Way, Inc.*, 943 F.Supp. 1083, 1095 n. 9 (D.Minn. 1996); *LeBlond v. Greenball Corp.*, supra at 1217; *Reiff v. Interim Personnel, Inc.*, 906 F.Supp. 1280, 1288 n. 3 (D.Minn.1995), citing *Stacks v. Southwestern Bell Yellow Pages, Inc.*, supra.

19. In a typical disparate treatment discharge case, the plaintiff must also demonstrate that, after her termination, her position was filled by a person who was not a member of the protected class. However, in cases where, as here, the plaintiff's position was eliminated altogether, she is not required to proffer this final showing. See, *Polacco v. Curators of University of Missouri*, 37 F.3d 366, 369 (8th Cir.1994).

its decision, then the employee is entitled to a finding of intentional discrimination. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 510 n. 3, 113 S.Ct. 2742, 2748 n. 3, 125 L.Ed.2d 407 (1993). Under this burden-shifting approach, the plaintiff retains the ultimate burden of persuasion, that the employer's proffered reason is pretextual, and that the plaintiff has, in fact, been a victim of intentional discrimination. *Id.* at 506–12, 113 S.Ct. at 2746–50; accord, *Hasnudeen v. Onan Corp.,* 552 N.W.2d 555, 557 (Minn. 1996) (construing MHRA). In sustaining this burden of persuasion, however, "a reason cannot be proved to be 'a pretext *for discrimination'* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Center v. Hicks,* supra at 515, 113 S.Ct. at 2751–52 [emphases in original].

### b. *The Plaintiff's Retaliation Claim.*

Title VII, and the MHRA, each prohibit employers from retaliating against employees who oppose an unlawful employment practice, or who assist others in asserting their employment rights. *Title 42 U.S.C. § 2000e–3(a); Minnesota Statutes Section 363.03, subd. 7.* Moreover, under either the MHRA or Title VII, such claims are evaluated under the three-part *McDonnell–Douglas* framework. See, *Womack v. Munson,* 619 F.2d 1292, 1296 (8th Cir.1980), cert. denied, 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981); *Hubbard v. United Press International,* 330 N.W.2d 428, 444 (Minn.1983). Accordingly, the plaintiff must establish a *prima facie* case of retaliation by demonstrating the following:

1. that she engaged in a protected activity;
2. that an adverse employment action occurred; and
3. that a causal connection is established between the Two.

*Sweeney v. City of Ladue,* 25 F.3d 702, 703 (8th Cir.1994); *Sherpell v. Humnoke School Dist. No. 5,* 874 F.2d 536, 540 (8th Cir.1989); *Womack v. Munson,* supra at 1296; *Callanan v. Runyun,* 903 F.Supp. 1285, 1300 (D.Minn.1994), aff'd, 75 F.3d 1293 (8th Cir. 1996); *Hubbard v. United Press International,* supra at 444.

In keeping with the *McDonnell–Douglas* analysis, once the plaintiff has made out a *prima facie* case of retaliation, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged action. *Womack v. Munson,* supra; *Hubbard v. United Press International,* supra. The employer is not required to prove the absence of a retaliatory motive, but must only produce evidence that would dispel the inference of retaliation by establishing the existence of a legitimate reason for the challenged action. *Womack v. Munson,* supra. If the employer satisfies this burden of production then, to prevail, the employee must demonstrate that the proffered justification is actually a pretext for retaliation. *Id.*

### c. *The Plaintiff's Wage Discrimination Claims under Title VII and Minnesota Statutes Section 181.67.*

Minnesota Statutes Section 181.67 prohibits wage discrimination which is premised upon gender, and the *McDonnell–Douglas* analysis applies to wage discrimination claims that are brought under both this Statute, and under Title VII. See, *EEOC v. Delight Wholesale Co.,* 973 F.2d 664, 669 (8th Cir.1992) (Title VII); *Kolstad v. Fairway Foods, Inc.,* 457 N.W.2d 728, 734 (Minn.App. 1990) (Section 181.67); *Schiele v. Charles Vogel Mfg. Co., Inc.,* 787 F.Supp. 1541, 1556 (D.Minn.1992) (same) Under Section 181.67, a plaintiff may establish a *prima facie* case with evidence of " 'an employer paying different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skills, effort and responsibility * * * .' " *Kolstad v. Fairway Foods, Inc.,* supra at 734, quoting *Danz v. Jones,* 263 N.W.2d 395, 400 (Minn.1978). Nevertheless, "[d]ifferences in wages are not unlawful in Minnesota if based on a seniority system, a merit system, a system which measures earnings by quantity or quality of production, or a wage differential based on any factor other than sex." *Kolstad v. Fairway Foods, Inc.,* supra. As a consequence, proof of any of these systems or permissible differentials rebuts the plaintiff's *prima facie* case, and forces her to show pretext. *Id.*

In a similar vein, a *prima facie* case of gender-based wage discrimination, under Title VII, requires a virtually identical showing on the part of the complaining plaintiff, for the claimant must prove "that the employer pays different wages to employees of opposite sexes for 'equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions.'" *EEOC v. Delight Wholesale Co.*, supra at 669, quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974); see also, *McKee v. Bi-State Dev. Agency*, 801 F.2d 1014, 1019 (8th Cir.1986).

2. *Legal Analysis.* With the foregoing precepts to focus our analysis, we proceed to address the Plaintiff's gender based claims.

a. *The Plaintiff's Gender Discrimination and Section 181.67 Claims.*

In her Complaint, the Plaintiff alleges that she has been subjected to the following four forms of disparate treatment, which was gender-based:

1. unequal conditions of employment;
2. unequal discipline;
3. unequal wages; and
4. termination.

*Complaint*, at ¶ 40.

The Plaintiff asserts that she has both direct and circumstantial evidence of discrimination and, therefore, we will examine her claims under the mixed-motive, or the pretext framework, as appropriate.

Normally, when the employee, as here, alleges both direct and circumstantial evidence of discrimination, the Court begins by analyzing the direct evidence.[20] Thus, "[i]f the Plaintiff has failed to satisfy the Price Waterhouse threshold, the case should be decided under the principles announced in *McDonnell–Douglas* [.]" *Radabaugh v. Zip Feed Mills, Inc.*, supra at 448 [citations omitted]. As recently expressed by our Court of Appeals, "[a]fter all, the *McDonnell–Douglas* framework exists to provide discrimination plaintiffs a way to prove their case when they do not have 'explicit, inculpatory evidence of discriminatory intent[;]' if a plaintiff does have such evidence, burden-shifting analysis is unnecessary." *Shannon v. Ford Motor Co.*, 72 F.3d 678, 682 (8th Cir.1996) [emphasis in original] quoting *Hutson v. McDonnell Douglas*, supra at 776.

Here, the Plaintiff's "direct" evidence of gender-based animus is solely contained within Klug's earlier-referenced statement to her when, in January of 1994, she attempted to perform her "general labor" duties:

> You're making my guys look bad. You're always seen working, and I don't want you working here. They're talking about laying off one of my men, and I will not have you working here and lose one of my men. So I don't want you to work here anymore because *you're making my guys look bad.*

[Emphasis supplied].

Viewed objectively, we conclude that this commentary serves as direct evidence of sex-based, disparate treatment. Indisputably, after Klug made this remark, the Plaintiff was no longer allowed to perform the miscellaneous general duties that she had previously performed—with apparent enjoyment—and those duties were then reserved solely for the City's male maintenance employees. Furthermore, within four-and-a-half months after this incident, the Plaintiff's "general labor" duties were formally eliminated from her job description. While this latter action was taken by the Executive Board, of which Klug was not a member, the Record before the Court strongly intimates that the original decision, to prohibit the Plaintiff from performing general City maintenance work, was made by Klug alone, and that this decision was only confirmed by the Executive Board's subsequent action. Accordingly, with re-

---

**20.** In this respect, our Court of Appeals, in *Stacks v. Southwestern Bell Yellow Pages, Inc.* supra at 202, observed that *"Price Waterhouse* requires the district court to make an explicit finding whether the case is or is not a 'mixed motives' case." Here, while the Plaintiff does frame most of her argument under *McDonnell Douglas,* the following discussion, as taken from her Opposition Memorandum, suggests that she also seeks to partially proceed under the mixed motive paradigm:

> Because there is some direct evidence of discrimination, the mixed motives inquire set forth in *Price Waterhouse v. Hopkins,* * * * is applicable.

*Plaintiff's Memorandum in Opposition,* at 26.

spect to the Plaintiff's unequal conditions of employment claim, we conclude that she has satisfied her initial burden, under *Price Waterhouse,* of showing that an illegitimate criterion—here, gender-based animus—was a motivating factor in the employer's decision to take action, which had an adverse impact upon her employment circumstance. See, *Philipp v. ANR Freight System, Inc.,* supra at 673; *Cram v. Lamson & Sessions Co.,* supra at 471.

Having satisfied her initial burden, the burden of production shifts to the Defendant to demonstrate that the Plaintiff would have been relieved of her miscellaneous maintenance job responsibilities, in the absence of illegitimate gender-based discrimination. See, *Philipp v. ANR Freight System, Inc.,* supra. Notwithstanding this burden-shifting, the Defendant has failed to proffer any explanation as to why the Plaintiff's general labor duties were terminated—let alone, an explanation which would serve to counteract the inference of discrimination which has been raised by Klug's commentary. For this reason, we conclude that the Defendant's Motion for Summary Judgment, on the Plaintiff's unequal employment conditions claim, must be denied, as the Plaintiff has successfully raised a genuine issue of material fact as to this claim.[21]

We conclude, however, that Klug's comments do not constitute direct evidence of discrimination in support of the Plaintiff's remaining disparate treatment claims for, within these contexts, his remarks are inadequate in demonstrating the requisite "specific link between the discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the challenged decision." *Id.* In this respect, we

are satisfied that Klug was not a "decisionmaker" for any of the challenged determinations which undergird the Plaintiff's remaining claims. With respect to her unequal pay and termination claims, the Record clearly reveals that the decisions, which underlie these claims, were made by the City Council, of which Klug was not a member. As a consequence, the challenged determinations as to employee pay scales, as well as that of closing the Ambulance Service, and terminating the Plaintiff's employment, were all made by the City Council, without any evidence of Klug's personal involvement. The possibility that Klug may have fostered a gender-based hostility towards the Plaintiff is of no consequence in analyzing these claims, since that animus could not—at least on the present state of this Record—be reasonably attributable to the City Council, which was the operative decisionmaker. See, *Philipp v. ANR Freight System, Inc.,* supra; *Beshears v. Asbill,* supra at 1354; *Hermeling v. Montgomery Ward & Co., Inc.,* supra at 1378.

With respect to the Plaintiff's claim of unequal discipline, the decisions being challenged were those of the Plaintiff's superiors; namely, the City Council, and the Executive Board. As we have already observed, at all relevant times, Klug was not a City Councilperson, and the Record reveals that he was never a member of the Executive Board. Therefore, we find no evidentiary basis to "link-up" his asserted discriminatory animus with those decisions which produced the disciplinary actions that the Plaintiff has challenged here.

Accordingly, having determined that the Plaintiff cannot—by resort to direct evidence—stave off an adverse award of Summary Judgment on her remaining disparate

---

**21.** Although, as noted, the Minnesota Courts do not employ the mixed motive framework in employment discrimination cases, this fact does not entitle the Defendant to Summary Judgment on the Plaintiff's MHRA claim of unequal employment conditions. Under the MHRA, the Plaintiff may, as she has done with this particular claim, initially establish her *McDonnell–Douglas prima facie* case by resort to direct evidence. See, *Dietrich v. Canadian Pacific, Ltd.,* 536 N.W.2d 319, 323 (Minn.1995); *Sigurdson v. Carl Bolander & Sons, Co.,* 532 N.W.2d 225, 228 (Minn. 1995); *Feges v. Perkins Restaurants, Inc.,* 483 N.W.2d 701, 710 (Minn.1992). Having estab-

lished a *prima facie* case by direct evidence, the Plaintiff's claim must then be evaluated under the remaining steps of the *McDonnell–Douglas* framework and, therefore, at step two, the Defendant bears the burden of producing a legitimate and nondiscriminatory reason for the decision to relieve the Plaintiff of her miscellaneous maintenance duties. As noted, however, the Defendant has proffered no nondiscriminatory rationale, whatsoever, for this action and, therefore, we may not grant Summary Judgment on the Plaintiff's unequal conditions of employment claim, under the MHRA.

treatment claims, we turn our analysis to those same State and Federal claims, under the burden-shifting framework of *McDonnell–Douglas.*

### 1. The Plaintiff's Unequal Discipline Claim.

■ As near as we can tell, the Plaintiff's unequal discipline claim is premised solely upon Eibensteiner's directive, which appears to have been voiced at the behest of both the City Council and the Executive Board,[22] that the Plaintiff was not to be seen riding in and City vehicles. The Plaintiff argues that this action was fueled by gender-based discrimination because Bunker, who was the City maintenance worker with whom she had been so travelling and with whom she was rumored to be romantically involved, was not also prohibited from riding in City vehicles. We need not decide, however, whether these allegations serve to establish a *prima facie* case under *McDonnell–Douglas,* for we conclude that the Plaintiff has not met her burden of demonstrating that the Defendant's explanation, for this assertedly unequal treatment, was a pretext for discrimination. See, e.g., *Aucutt v. Six Flags Over Mid–America, Inc.,* 85 F.3d 1311, 1316 (8th Cir. 1996) (Court assumed existence of *prima facie* case to sustain Summary Judgment on employee's failure to rebut, as pretextual, employer's business reasons); *Braziel v. Loram Maintenance of Way, Inc.,* 943 F.Supp. 1083, 1105 (D.Minn.1996).

Here, David E. Decker ("Decker"), who is the Defendant's City Clerk, and who witnessed the challenged directive, has averred that the Plaintiff was directed to refrain from riding in City public works vehicles "due to the fact that she had no purpose riding in those vehicles and that she was supposed to be attending to her duties as the Ambulance Director." *Affidavit of David E. Decker,* at 95. Decker further attests that Bunker was not similarly barred from the use of City public works vehicles because, as an employee of the City's maintenance department, he "had a legitimate reason to be riding in the public works department vehicles * * *." *Id.* Further, Decker avers that the Plaintiff was not subjected to any disciplinary steps,

other than being instructed to stay out of the public works vehicles. *Id.*

In response to these legitimate business reasons, the Plaintiff has presented no showing that the proffered reasons were a pretext for discrimination and, therefore, she has failed to sustain her burden at step three in the *McDonnell–Douglas* framework, and we conclude, therefore, that the Defendant's Motion for Summary Judgment on this claim should be granted. See, *St. Mary's Honor Center v. Hicks,* supra at 515, 113 S.Ct. at 2751–52.

### 2. The Plaintiff's Unequal Pay Claim.

■ The Plaintiff stresses that Klug, who was the City's maintenance supervisor, and Ward, who served as the municipal liquor store manager, were paid higher wages than her in her capacity as the Ambulance Director. Since she argues that these differentials were the product of illegal wage discrimination, her unequal pay claims are grounded upon an initial assumption that her position as Ambulance Director involved " 'equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions.' " *EEOC v. Delight Wholesale Co.,* supra at 669. However, following our close review, we disagree with this assumption, as we conclude that the Plaintiff has failed to present a *prima facie* showing of wage discrimination and, as a consequence, the Defendant's Motion for Summary Judgment, on the unequal pay claims, should be granted.

The "equal work for unequal pay" paradigm requires equality in the work that is used to suggest an improper differential in pay. See, e.g., *EEOC v. Cherry–Burrell Corp.,* 35 F.3d 356, 358–59 (8th Cir.1994) (female plaintiff, as only junior buyer, performed "substantially similar duties" as male buyers, but for less pay); *EEOC v. Delight Wholesale Co.,* supra at 667 (plaintiff demoted and replaced by male worker who performed same work for higher pay); *Schiele v. Charles Vogel Mfg. Co., Inc.,* supra at 1556 (after constructive discharge, plaintiff replaced by male successor who was paid

---

**22.** As noted, Eibensteiner was a member of both of these bodies.

"much higher salary"); *Kolstad v. Fairway Foods, Inc.*, supra at 734 (same). This prerequisite for recovery, however, is not presented here, as the Plaintiff cannot demonstrate that her job duties, as Ambulance Director, were performed by male counterparts who made a higher wage and, indeed, the Record reflects that the Plaintiff was the only person who ever held the Ambulance Director's position.

Instead, to establish her *prima facie* showing, the Plaintiff has sought to equate her job duties and responsibilities with those of Ward and Klug. However, such comparisons necessarily evoke "apples to oranges" associations which do not properly serve to establish the Plaintiff's *prima facie* case of wage discrimination. To begin with, the background qualifications for each of the three purportedly comparable positions is markedly different. The Ambulance Director's position required a current Minnesota EMT certification, and a minimum of two years experience in "practical EMS field experience ...." *Affidavit of Sharon Bunker, fka Brekke, Exhibit 7*. In contrast, the maintenance supervisor's position required pertinent State wastewater and water treatment licenses, and mandated that the supervisor have a minimum of five years of prior experience with heavy equipment, and two years experience with plumbing equipment and water pumps. *Affidavit of Sharon Bunker, fka Brekke, Exhibit 32*. The liquor store manager, on the other hand, was not required to demonstrate such technical competence, but the position's job description reflected that the jobholder should preferably have completed "some post-secondary training in business administration with some coursework in retail marketing or related subjects[,]" and that, prior to assuming the position, the manager "should have progressively responsible liquor store operations experience." *Affidavit of Sharon Bunker, fka Brekke, Exhibit 9*.

Furthermore, notwithstanding the Plaintiff's arguments to the contrary, we conclude that the three positions entailed substantially different job responsibilities. As has been noted, the Plaintiff's position chiefly required that she serve as the Ambulance Service's primary EMT, and that she "[m]aintain the ongoing roster, training and CEU records,

of the volunteer personnel." *Affidavit of Sharon Bunker, fka Brekke, Exhibit 7*. In addition, toward the end of her term of employment, the Plaintiff was assigned a considerable amount of billing, bookkeeping, and related duties. Id. The maintenance supervisor's position, on the other hand, was almost exclusively involved with the physical upkeep of City lands, buildings and equipment. *Affidavit of Sharon Bunker, fka Brekke, Exhibit 32*. Lastly, the liquor store manager's position entailed job responsibilities that were not shared by either of the other positions, such as wholesale purchasing, product pricing, and daily banking activities. *Affidavit of Sharon Bunker, fka Brekke, Exhibit 9*. Indeed, both the maintenance supervisor, and the liquor store manager, were responsible for supervising and disciplining paid City employees, see, *Affidavit of Sharon Bunker, fka Brekke, Exhibits 9 and 32*, which starkly distinguish these positions from the former Ambulance Director position, as the staff there was wholly comprised of volunteers.

Accordingly, we conclude that the Plaintiff has failed to establish a *prima facie* case of gender-based wage discrimination, under either Title VII or Section 181.67. As a consequence, these claims are legally without merit, and we grant the Defendant's Motion for Summary Judgment on both claims.

### 3. *The Plaintiff's Termination Claim.*

 The Plaintiff's final claim of disparate treatment discrimination arises from her termination, which she alleges was motivated by gender-based animus. We agree that the Plaintiff has established a *prima facie* case of gender-based discrimination but, since she has failed to proffer evidence which would allow a factfinder to reasonably find that the Defendant's proffered business reason for her termination was a pretext for illegal discrimination, we conclude that the Defendant's Motion for Summary Judgment on this claim should be granted.

In our view, the Plaintiff has established each of the three showings that are necessary to her *prima facie* case. First, as a woman, she is a member of a protected class and, second, it is undisputed that she met the minimum qualifications for the Ambulance

Director's position. Third, since her position was terminated, she unquestionably suffered an adverse employment decision. Nevertheless, the Defendant has met its burden of production, at step two of the *McDonnell–Douglas* analysis, by demonstrating a legitimate and nondiscriminatory reason for the Plaintiff's termination. In this respect, Decker has offered the following testimony:

> [T]he abolishing of the Ambulance Service ... and the contracting out by the City for ambulance services from the Blackduck Ambulance Association was based strictly upon economic and manpower considerations in that there were great problems in finding volunteers to man the Ambulance service during the tenure of [the Plaintiff]

*Affidavit of David E. Decker,* at ¶ 4.

In challenging this testimony, the Plaintiff argues that the stated reason for terminating the ambulance services is pretextual, because the manpower shortages could have been remedied by allowing her to train a new cadre of volunteers. Accordingly, she maintains that she has demonstrated the pretextual nature of the Defendant's business rationale for her termination, and that, as a consequence, we should deny the Defendant's Motion for Summary Judgment on this claim. We disagree.

First, we are not persuaded that the Plaintiff's pretext argument has the ardor she attributes to it. For instance, we note that, throughout the period in which the Plaintiff served as Ambulance Director, the Ambulance Service experienced periodic shortages of volunteers, and that, from as early as February of 1992, the City Council was sufficiently concerned about this state of affairs, that it considered selling the Service to a private party. While not dispositive of the issue before us, these historic facts undermine the vitality of the Plaintiff's suggestion of pretext.

Second, and far more fundamentally, the Plaintiff cannot survive the Defendant's Summary Judgment Motion merely by offering evidence that the Defendant's reason for her termination was pretextual, for she must show that the proffered reason was a pretext for gender-based discrimination. *St. Mary's Honor Center v. Hicks,* supra at 515, 113 S.Ct. at 2751–52; *Rothmeier v. Investment*

*Advisers, Inc.,* 85 F.3d 1328, 1334 (8th Cir. 1996). In the words of our Court of Appeals:

> Hicks allows a trial judge to decide on a motion for summary judgment that the evidence is insufficient for a reasonable trier of fact to infer discrimination even though the plaintiff may have created a factual dispute as to the issue of pretext. Intentional discrimination *vel non* is like any other ultimate question of fact: either the evidence is sufficient to support a finding that the fact has been proven, or it is not. Indeed, *Hicks* emphasizes that once an employment discrimination case reaches the third stage of *McDonnell–Douglas*, it is to be treated like any other case. Trial courts or reviewing courts should not "treat discrimination differently from other ultimate questions of fact." *Hicks,* 509 U.S. at 524, 113 S.Ct. at 2756 * * *

*Rothmeier v. Investment Advisers, Inc.,* supra at 1337; see also, *Ryther v. KARE 11,* 108 F.3d 832, 836–38 (8th Cir.1997) ("the plaintiff must produce sufficient evidence of the elements of the prima facie case and where necessary, adduce sufficient proof of pretext to meet the traditional tests of the summary judgment and judgment as a matter of law") [*en banc*].

Here, even if we were to assume that the Defendant's stated reason for terminating the Plaintiff was false and, therefore, pretextual, she has not offered an evidence which could allow a reasonable factfinder to infer that this falsehood was a pretext for discrimination. Of course, we do not discount the possibility that the decision to eliminate the Plaintiff's position was ill-advised, or somehow motivated by personal dislike for the Plaintiff but, nonetheless, "[a]n employer's business decision ... need not be a good decision to withstand a challenge for sex discrimination; it is enough that it is not motivated by the gender of the employee who is adversely affected by the decision." *Brandt v. Shop 'n Save Warehouse Foods, Inc.,* 108 F.3d 935, 939(8th Cir.1997).

In the final analysis, we remain mindful that "the employment discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of

the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Hutson v. McDonnell Douglas Corp.*, supra at 781. Here, the Plaintiff has failed to proffer a showing which would allow a reasonable finder of fact to infer that her discharge was motivated by impermissible, gender-based discrimination and, accordingly, the Defendant's Motion for Summary Judgment on this aspect of her claim is granted.

In sum, as to the Plaintiff's claims of gender-based, disparate treatment, the Defendant's Motion for Summary Judgment, on the Title VII and MHRA claims of unequal discipline, unequal pay, and termination, are granted. In addition, we grant the Motion for Summary Judgment on the Plaintiff's Section 181.67 wage discrimination claim. Lastly, the Motion for Summary Judgment, on the Plaintiff's Title VII and MHRA claims of unequal conditions of employment, is denied.

b. *The Plaintiff's Retaliation Claims.*

■■■ The Plaintiff's allegations of unlawful retaliation fall within two distinct claims. First, she alleges that the Defendant terminated her position in order to retaliate against her for filing her EEOC charges. Second, she asserts that the Defendant's agents have engaged in similar retaliatory acts, but which fell somewhat short of an outright discharge. We address each of these claims in turn.

We have no difficulty in concluding that the Plaintiff has established the first two elements of a *prima facie* case of retaliatory discharge. As to these elements, it is axiomatic that the filing of an EEOC charge is statutorily protected activity, *Callanan v. Runyun*, supra at 1300; see also, *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3rd Cir.1989), cert. denied, 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990); *Clark v. Com. of Pennsylvania*, 885 F.Supp. 694, 709 (E.D.Pa.1995), and we believe that it is self-evident that a job termination is an adverse employment action. Whether the Plaintiff can establish the third element of her *prima facie* case, by demonstrating a causal link between the protected activity and her discharge, is, in our view, a much closer question. Essentially, the Plaintiff argues that, because her termination chronologically followed the filing of her EEOC charges, the charges must have been the causative agent for her discharge. Of course, this formulation is simply a variant upon the classic fallacy of logic known as *"post hoc, ergo propter hoc "*—literally, "after this, therefore because of this." As the fallacy is explained, the mere fact that one event follows another says nothing about their causal relationship—otherwise night would cause the day and, despite the Plaintiff's arguments to the contrary, in retaliation cases, a sequence involving protected activity followed by an adverse employment decision does not, necessarily, produce a finding of causation. See, *Sweeney v. City of Ladue,* supra at 703–04.

We need not, however, resolve the causation question for, even assuming a causal connection, the Plaintiff has failed to rebut the Defendant's articulated, business reason for her termination, by producing evidence that would allow a reasonable trier of fact to infer that the reason was merely a pretext for impermissible retaliation. Here, at the second step of the *McDonnell–Douglas* analysis, the Defendant has offered the same nondiscriminatory rationale for the Plaintiff's termination that was offered to contravene her *prima facie* showing of discriminatory discharge—namely, that her position was eliminated because of manpower considerations. *Affidavit of David E. Decker,* at ¶ 4. Although the Plaintiff argues that this reason is pretextual, because manpower concerns could have been alleviated by allowing her to train new volunteers, this rebuttal has demonstrably less force than when raised within the context of the Plaintiff's discrimination discharge claim, since the Record clearly reveals that the Plaintiff was denied permission to train new volunteers even before she had filed her first EEOC charge. Moreover, as with her discrimination claim, the Plaintiff offers no evidence which even colorably suggests that the proffered rationale for her termination was not only fallacious, but also a pretext for illegal retaliation and, for this reason, she has failed to sustain her burden at step three under *McDonnell–Douglas.* Accordingly, Summary Judgment in favor of the Defendant is appropriate on this aspect of the Plaintiff's claim.

■■■ We conclude, however, that the Plaintiff has offered a showing which is suffi-

cient to allow her reprisal claim, as to those acts other than her discharge, to withstand the Defendant's Motion for Summary Judgment. In this respect, the Plaintiff underscores a series of acts, by the agents of the Defendant, which she believes constitute a *prima facie* showing of reprisal. These acts include the incident involving the City Council meeting and the foundationless complaint letter, and Beighley's ostensible campaign to solicit, and to publicly air, unfavorable commentary as to the Plaintiff's job performance, in an asserted effort to assist the City in combating the Plaintiff's original EEOC charge.[23]

We can accept, for these purposes, that such acts can properly serve as "adverse employment actions," within the framework of the Plaintiff's *prima facie* case. See, *e.g.*, *Clark v. Com. of Pennsylvania*, supra at 709 (employer spreading false rumors that plaintiff was having an affair was an adverse employment action); *Long v. AT&T Information Systems, Inc.*, 733 F.Supp. 188, 205–06 (S.D.N.Y.1990) (reprimand issued against employee shortly after filing of EEOC charge gave rise to *prima facie* case of retaliation). Similarly, we have no difficulty in finding a causal nexus between the Plaintiff's protected activity, in filing EEOC charges, and these asserted adverse acts, since she has introduced competent evidence which suggests that Beighley's conduct was directed at countering the Plaintiff's first EEOC complaint—perhaps unfairly. Therefore, we conclude that the Plaintiff has met her burden of establishing a *prima facie* case for this portion of her reprisal claim.

Moreover, we find that, at step two of the *McDonnell–Douglas* framework, the Defendant has neglected to advance any legitimate and nondiscriminatory reasons for the actions of Beighley. Accordingly, we conclude that the Defendant has not demonstrated an entitlement to Judgment, as a matter of law,

on this factually disputed claim. Again, to summarize, the Defendant's Motion for Summary Judgment, on the Plaintiff's retaliatory discharge claims, is granted, but its Motion for Summary Judgment, on the remaining reprisal claims, is denied.

C. *The Plaintiff's Section 1983 Claims.*

Title 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

To prevail on her Section 1983 claims, the Plaintiff must demonstrate:

1. that the conduct complained of was committed by persons acting under color of State law; and

2. that this conduct deprived the Plaintiffs of a right, privilege or immunity secured by the Constitution or laws of the United States.

*Id.; Hamilton v. Schriro*, 74 F.3d 1545, 1549 (8th Cir.1996), cert. denied, —— U.S. ——, 117 S.Ct. 193, 136 L.Ed.2d 130 (1996); *Thomas v. Gunter*, 32 F.3d 1258, 1259 (8th Cir.1994).

Here, there is no dispute that the challenged acts were performed under color of State law and, as a consequence, our analysis necessarily focuses on whether the Plaintiff has been deprived of any right which is protected by the Constitution, or by Federal law.[24]

---

**23.** The Record is unclear whether Beighley undertook these actions as a member of the Executive Board, or as a private citizen. The Defendant offers no argument on this issue, and the lack of clarity in the Record on this point highlights the presence of genuine issues of material fact, which preclude, at this time, an award of Summary Judgment in the Defendant's favor.

**24.** In her Complaint, the Plaintiff boldly asserts—without further elaboration—that the Defendant has violated her right to equal protection of the laws, as well as her "right to privacy as a private citizen." *Complaint*, at ¶¶ 33 and 37. As she does not provide any further factual or legal argument in support of these claims, and in opposition to the Defendant's Motion, we grant

### 1. *The Plaintiff's Procedural Due Process Claims.*

In her Complaint, the Plaintiff alleges that she holds a constitutionally protected property interest in her position as the Ambulance Director, and protected liberty interests in "her good name," and in "pursuing her profession as an *EMS* Technician." *Complaint*, at ¶ 33. She further alleges that the Defendant deprived her of these interests without complying with the requisites of procedural due process. *Id.*, at ¶ 35.

a. *Standard of Review.* Necessarily, procedural due process claims involve a two-step inquiry, with the first step requiring an assessment of whether a liberty or property interest exists which has been traversed. Only if this threshold question is answered in the affirmative, do we then inquire if the procedures attendant to that deprivation were constitutionally sufficient. *Kentucky Department of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989).

Of course, it is axiomatic "that there exists a variety of interests which are difficult of definition but are nevertheless comprehended within the meaning of either 'liberty' or 'property' " as meant in the Due Process Clause. "These interests attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law, and we have repeatedly ruled that the procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter that protected status." *Paul v. Davis*, 424 U.S. 693, 710–11, 96 S.Ct. 1155, 1165, 47 L.Ed.2d 405 (1976). As the pertinent criteria for the establishment of these interests differ, we separately set forth the pertinent factors.

 i. *Liberty Interests.* "In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed." *Board of Regents v. Roth*, 408 U.S. 564, 572, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972). Nevertheless, the Supreme Court has squarely rejected the proposition "that reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection

the Motion for Summary Judgement upon these

of the Due Process Clause." *Paul v. Davis*, supra at 701, 96 S.Ct. at 1161; *Bishop v. Wood*, 426 U.S. 341, 348–50, 96 S.Ct. 2074, 2079–80, 48 L.Ed.2d 684 (1976). Furthermore, termination from State employment only gives rise to a deprivation of a protected liberty interest "where an employee's 'good name, reputation, honor, or integrity is at stake because of what the government is doing to him.' " *Mascho v. Gee*, 24 F.3d 1037, 1039, (8th Cir.1994), quoting *Board of Regents v. Roth*, supra at 573, 92 S.Ct. at 2707. As a consequence, "[t]o establish such a claim, the employee must show defamation by a state official, and that the defamation occurred in the course of the termination of employment." *Mascho v. Gee*, supra at 1039, citing *Paul v. Davis*, supra at 710, 96 S.Ct. at 1165.

"Defamation, for purposes of a due process claim, occurs when a state official 'publicly made allegedly untrue charges against [the employee] that would stigmatize [her] so as to seriously damage [her] standing and associations in [her] community, or foreclose [her] freedom to take advantage of other employment opportunities.' " *id.*, quoting *Shands v. City of Kennett*, 993 F.2d 1337, 1347 (8th Cir.1993), cert. denied, 510 U.S. 1072, 114 S.Ct. 880, 127 L.Ed.2d 75 (1994); see also, *Codd v. Velger*, 429 U.S. 624, 626–28, 97 S.Ct. 882, 883–84, 51 L.Ed.2d 92 (1977); *Bishop v. Wood*, supra at 348, 96 S.Ct. at 2079; *Paul v. Davis*, supra at 709–10, 96 S.Ct. at 1164–65; *Board of Regents v. Roth*, supra at 573–74, 92 S.Ct. at 2707–08. The requisite stigma has been generally reserved for cases in which the employer has accused the employee of "dishonesty, immorality, criminality, racism, or the like." *Shands v. City of Kennett*, supra at 1347, citing *Green v. St. Louis Housing Authority*, 911 F.2d 65, 69 (8th Cir.1990); see also, *Mascho v. Gee*, supra at 1039; *Robinson v. City of Montgomery City*, 809 F.2d 1355, 1356 (8th Cir.1987); *Nathanson v. United States*, 630 F.2d 1260, 1264–65 (8th Cir.1980). Under this standard, "general allegations of misconduct and insubordination [do] not rise to the requisite level of constitutional stigma[,]" nor may the stigma "be created by

claims without further discussion.

innuendo from inferences drawn from general allegations of misconduct and insubordination." *Mascho v. Gee, supra* at 1039, *citing Shands v. City of Kennett, supra* at 1347.

ii. *Property Interests.* "The Fourteenth Amendment places procedural constraints on the actions of government that work a deprivation of interests enjoying the stature of 'property' within the meaning of the Due Process Clause." *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978). What constitutes a "property interest"—deserving of constitutional protection—has been something of a vexatious question. Nevertheless, in a pair of companion cases, the Supreme Court took pains to explore the full meaning of a "property" interest which is protected by procedural due process. In *Board of Regents v. Roth,* supra, the plaintiff sued his employer, a State University, claiming that his employer's refusal to renew his one-year term of employment was a denial of a constitutionally sheltered property interest. In discussing the attributes of such a property interest, the Supreme Court explained:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.
>
> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.* at 577, 92 S.Ct. at 2709.

In applying these considerations to the circumstances in *Roth,* the Court noted that neither the laws governing the plaintiff's employment with the University, nor the terms of his contractual relationship with that employer, provided for a "renewal" of his contract after his existing one-year contract expired. As such, the Court concluded that the plaintiff "did not have a *property* interest sufficient to require the University authorities to give him a hearing when they declined to renew his contract of employment." *Id.* at 578, 92 S.Ct. at 2710 [emphasis in original]

On the same day that *Roth* was issued, the Supreme Court decided the similar, but distinctly disparate, circumstances of *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). There, the plaintiff was also a nontenured professor at a State Junior College whose one-year contract was not renewed. Unlike its determination in *Roth,* the Court concluded that the plaintiff had alleged a property interest, deserving of constitutional protection, because his employer had guidelines and "binding understandings" which implicated a right to contract renewal. In reliance upon *Roth,* the Court restated the attributes of a property interest, which would be worthy of constitutional protection, as follows:

> We have made clear in *Roth* ..., that "property" interests subject to procedural due process protections are not limited by a few rigid, technical forms. Rather "property" denotes a broad range of interests that are secured by "existing rules or understandings." ... A person's interest in a benefit is a "property" interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit that he may invoke at a hearing.

*Id.* at 601, 92 S.Ct. at 2699 [citations omitted].

Notably, "[a]lthough the underlying substantive interest is created by 'an independent source such as state law,' federal constitutional law determines whether the interest rises to the level of entitlement' protected by the Due Process Clause." *Memphis Light, Gas & Water Div. v. Craft,* supra at 9, 98 S.Ct. at 1560; *see also, Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1030, 112 S.Ct. 2886, 2901, 120 L.Ed.2d 798 (1992) (Roth now the "traditional" approach).

■ b. *Legal Analysis.* Given these salient principles, we conclude that the Plaintiff has failed to establish the existence of a

protected "liberty" or "property" interest, which has been transgressed by the Defendant's actions.

First, we reject the Plaintiff's claim that she possessed a protected liberty interest in either her "good name" or in the pursuit of her chosen career. As the case authorities demonstrate, neither of these asserted liberty interests is cognizable in the absence of some showing that the Defendant terminated the Plaintiff's employment in a manner which was somehow defamatory or stigmatizing. Here, the Plaintiff can make no such demonstration, as the Record reflects that the City Council eliminated her position for economic reasons, which were unrelated to her performance and, further, that the Council published these economic reasons in the resolutions which abolished both the Ambulance Service, and the Plaintiff's position. Moreover, the pertinent resolutions are devoid of language which casts defamatory aspersions upon the Plaintiff's competence, performance, character or name and, therefore, she cannot responsibly assert that she was discharged under the stigmatization of "dishonesty, immorality, criminality, racism, or the like." *Shands v. City of Kennett*, supra at 1347. Therefore, the Plaintiff has failed to establish the presence of a protected liberty interest which was impermissibly trammeled by the conduct of the Defendant's agents.

■ The Plaintiff's property interest claim fares no better. In essence, she argues that she possessed a protected property interest in her position as the Ambulance Director, of which she could not be deprived without prior notice and an opportunity to be heard. Of course, if such a property interest does exist, then it has been created by a source which is independent of the Constitution, such as a contract, or an operative provision of State or local law. *Board of Regents v. Roth*, supra at 577, 92 S.Ct. at 2709. Here, however, the Plaintiff was not a contract employee and, under Minnesota law, "in the absence of a contract regarding grounds for discharge, employees serve at the will of their employers." *Singleton v. Christ the Servant Evangelical Lutheran Church*, 541 N.W.2d 606, 613 (Minn.App. 1996), pet. denied, (Minn., March 19, 1996), cert. denied, —— U.S. ——, 117 S.Ct. 184, 136 L.Ed.2d 123 (1996), citing *Spanier v. TCF Bank Sav.*, 495 N.W.2d 18, 21 (Minn.App. 1993), pet. denied, (Minn., March 22, 1993); see also, *Ruud v. Great Plains Supply, Inc.*, 526 N.W.2d 369, 371 (Minn.1995) ("The usual employer-employee relationship is terminable at the will of either party").

Here, however, the Plaintiff contends that the City's Basic Personnel Policy Resolution has altered her employment status into one in which she could only be terminated "for cause." If the Plaintiff is correct in this assertion, then she properly possesses a property interest in her former position, and she may not be legally terminated from that position unless she was first provided with a pre-termination opportunity to respond. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542–45, 105 S.Ct. 1487, 1493–95, 84 L.Ed.2d 494 (1985). Upon our close review, however, we find nothing in the City's Personnel Policy which invests the Plaintiff with anything more than a unilateral expectation of continued employment. Notably, the Policy provides that the City Council "may lay off any employee whenever such action is necessary because of shortage of work or funds, the *abolition of a position*, or changes in organization." *Affidavit of Sharon Bunker, fka Brekke, Exhibit 31* [emphasis supplied]. Thus, the City's Personnel Policy expressly anticipated the contingency which eventually occurred; that is, the Plaintiff's termination. As a consequence, the Policy does not serve to establish a protected property interest in the Plaintiff's position as the Ambulance Director.[25]

---

**25.** We note that the Personnel Policy provides that any Layoff of City personnel must be preceded by at least two week's notice— a contingency which, by all appearances, was not observed in the Plaintiff's case. Nevertheless, it is well-settled that the existence of State procedural protections does not, by itself, create a protected property interest in public employment. Instead, the process must create an expectation of continued employment, and not the mere expectation of notice or review prior to termination. *See, Akeyo v. O'Hanlon*, 75 F.3d 370, 374 (8th Cir.1996); *Stow v. Cochran*, 819 F.2d 864, 866–67 (8th Cir.1987); *Vruno v. Schwarzwalder*, 600 F.2d 124, 130–31 (8th Cir.1979).

Accordingly, the Defendant's Motion for Summary Judgment on the Plaintiff's Procedural Due Process claims is granted.

### 2. The Plaintiff's Substantive Due Process Claims.

■ a. *Standard of Review.* The Constitution embodies a concept of substantive due process, which prevents Government actors from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty. *United States v. Salerno,* 481 U.S. 739, 746, 107 S.Ct. 2095, 2100–01, 95 L.Ed.2d 697 (1987); *Marler v. Missouri State Bd. of Optometry,* 102 F.3d 1453, 1458 (8th Cir. 1996); *Brown v. Nix,* 33 F.3d 951, 953 (8th Cir.1994). "The theory of substantive due process is properly reserved for the truly egregious and extraordinary cases, and it proscribes certain government actions regardless of the fairness of the procedures used to implement them." *Zakrzewski v. Fox,* 87 F.3d 1011, 1014 (8th Cir.1996); see also, *Marler v. Missouri State Bd. of Optometry,* supra at 1458. Accordingly, substantive due process claims that assert a denial of a protected liberty interest are analyzed under two tests. First, the Government is forbidden from infringing upon certain "fundamental" liberty interests to any degree— no matter what process is provided—unless the infringement is narrowly tailored to serve a compelling governmental interest. *Brown v. Nix,* supra at 953, citing *Reno v. Flores,* 507 U.S. 292, 301–02, 113 S.Ct. 1439, 1446–47, 123 L.Ed.2d 1 (1993). Second, the Government's conduct somehow "must shock the conscience or otherwise offend our judicial notions of fairness, or must be offensive to human dignity." *Brown v. Nix,* supra at 953, citing *Weimer v. Amen,* 870 F.2d 1400, 1405 (8th Cir.1989).

■ Furthermore, as with similar claims which assert a denial of procedural due process, when analyzing a claim that the deprivation of property violates substantive due process rights, a Court must first consider whether the plaintiff has a protected property interest to which the protections afforded by due process apply. *Ellis v. City of Yankton, S.D.,* 69 F.3d 915, 917 (8th Cir. 1995); *Dover Elevator Co. v. Arkansas State University,* 64 F.3d 442, 445–46 (8th Cir. 1995). As has been noted, protected proper-

ty interests are created by State law, but Federal law determines whether the interest rises to the level of a constitutionally protected property interest. *Memphis Light, Gas & Water Div. v. Craft,* supra at 9, 98 S.Ct. at 1560.

■ b. *Legal Analysis.* "Substantive due process analysis must begin with a careful description of the asserted right for '[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.'" *Reno v. Flores,* supra at 302, 113 S.Ct. at 1447, quoting *Collins v. City of Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 1068–69, 117 L.Ed.2d 261 (1992). Here, our analysis is initially hampered because the Plaintiff has not clarified, with any specificity, the liberty and property interests, which she purportedly possessed, and which were assertedly breached in derogation of the strictures of substantive due process. Nevertheless, a close reading of both her Complaint, and the materials that she submitted in opposition to the Defendant's Motion, disclose that the purported protected interests at stake are the same interests which were implicated by her procedural due process claims. We conclude that none of these asserted interests are encompassed within the protections of the doctrine of substantive due process.

The Plaintiff's claim of property deprivation fails because, as noted, she did not possess a protected property interest in her position as the Ambulance Director. Similarly, the Plaintiff's remaining claims are without merit, as she offers no authority to bolster her contention that she has a fundamental right or similar liberty interest in retaining her position as the Ambulance Director. In this Circuit, a person who seeks to advance substantive due process rights beyond their current frontiers bears a heavy burden, see, *Brown v. Nix,* supra at 954, and, since she has failed to offer any support for her claimed substantive due process liberty interests, the Plaintiff has failed to shoulder that burden. Notably, interests which have been recognized as being protected, under substantive due process, generally involve those rights which are "so rooted in the

traditions or conscience of our people as to be ranked as fundamental." *United States v. Salerno,* supra at 751, 107 S.Ct. at 2103. Here, since the Plaintiff has offered no authority to support any such fundamental loss, and because we find that the elimination of her position neither "shock[s] the conscience[,] * * * offend[s] our judicial notions of fairness," nor is otherwise "offensive to human dignity," *Brown v. Nix,* supra at 953, her substantive due process claim fails.

### 3. The Plaintiff's First Amendment Claim.

The Plaintiff alleges that the Defendant retaliated against her for filing her charges with the EEOC, and that this asserted retaliation violated her First Amendment right to petition for redress of grievances, and to speak out on matters of public concern. While she does not precisely articulate the form that this retaliation took, we presume that the alleged acts of reprisal are the same as those upon which her retaliation claims, under Title VII and MHRA, were founded.

**■■■■** a. *Standard of Review.* It is well settled "that a State may not discharge an employee on a basis that infringes [upon] that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson,* 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987), citing *Perry v. Sindermann,* supra at 408 U.S. at 597, 92 S.Ct. at 2697–2698. Moreover, the employer may not engage in other similar retaliatory acts, which are short of discharge. See, *e.g., Hoffmann v. Mayor, Councilmen & Citizens of Liberty,* 905 F.2d 229, 233 n. 6 (8th Cir.1990). When considering a public employee's cause of action, which arises from actions that were assertedly taken as a reprisal against the employee's exercise of her First Amendment freedoms, a Court employs the same analysis, regardless of whether the claim arises from the First Amendment's petition clause, from its free speech clause, or from both. *Hoffmann v. Mayor, Councilmen & Citizens of Liberty,* supra at 233; accord *Valot v. Southeast Local School District Bd. of Educ.,* 107 F.3d 1220 (6th Cir. 1997); *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1059 (2nd Cir.1993), cert. denied, 510 U.S. 865, 114 S.Ct. 185, 126 L.Ed.2d 144 (1993); *Schalk v. Gallemore,* 906 F.2d 491, 498 (10th Cir.1990); *Rathjen v.*

*Litchfield,* 878 F.2d 836, 842 (5th Cir.1989; *Belk v. Town of Minocqua,* 858 F.2d 1258, 1281–62 (7th Cir.1988); *Gearhart v. Thorne,* 768 F.2d 1072, 1073 (9th Cir.1985); *Renfroe v. Kirkpatrick,* 722 F.2d 714, 715 (11th Cir. 1984), cert. denied, 469 U.S. 823, 105 S.Ct. 98, 83 L.Ed.2d 44 (1984).

**■■■■** As a result, an evaluation of such claims involves a two-step inquiry. First, the Court must consider whether the employee's speech can be "fairly characterized as constituting speech on a matter of public concern." *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983). If so, the second inquiry involves a weighing of the employee's right to free speech against the interests of the State, see, *Rankin v. McPherson,* supra at 388, 107 S.Ct. at 2899, in which the Court "must strike 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public service it performs through its employees.' " *Barnard v. Jackson County, Mo.,* 43. F.3d 1218, 1223 (8th Cir.1995), cert. denied, 516 U.S. 808, 116 S.Ct. 53, 133 L.Ed.2d 17 (1995), quoting *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). Each of these inquiries presents a matter of law, for the Court's resolution. *Connick v. Myers,* supra at 148 n. 7, 103 S.Ct. at 1691 n. 7; *Barnard v. Jackson County, Mo.,* supra at 1223.

**■■■■** If speech or conduct is determined to be protected under the *Connick* two-part test, "then a plaintiff must show that the speech played a substantial role in [her] discharge 'or, to put it in other words, that it was a motivating factor in the [discharge] decision.' " *Barnard v. Jackson County, Mo.,* supra at 1226, quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). If the plaintiff makes this showing, then the burden shifts to the defendant to prove "that it would have reached the same decision * * * even in the absence of the protected conduct." *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* supra at 287, 97 S.Ct. at 576. Ordinarily, the issue

of whether protected speech or conduct played a substantial role, in a public employee's termination, is an issue of fact to be resolved by a jury, see, *e.g.*, *Shands v. City of Kennett,* supra at 1347, but "the discharged employee does not in every case successfully resist a summary judgment merely by asserting that certain protected speech caused termination from public employment." *Barnard v. Jackson County,* Mo., supra at 1226; see also, *O'Connor v. Chicago Transit Authority,* 985 F.2d 1362, 1368 (7th Cir.1993) ("the mere fact that protected speech precedes an employment decision does not create the inference that the speech motivated the employment decision").

▉ b. *Legal Analysis.* At the outset, our analysis has been greatly simplified for, in *Greenwood v. Ross,* 778 F.2d 448, 457 (8th Cir.1985), our Court of Appeals held that, as a matter of law, the filing of an EEOC charge is a matter of public concern, and that the balance of competing interests weighs in favor of the Plaintiff. Accordingly, our inquiry proceeds to the next step of the analysis, in which the Plaintiff must demonstrate that her protected conduct, that is, the filing of the EEOC charges, was a substantial or motivating factor in her discharge, or in the Defendant's other acts of reprisal.

Given this framework, our remaining analysis of this claim can be truncated, for it essentially matches, stride-for-stride, our appraisal of the Plaintiff's claims of retaliation under Title VII and the MHRA. Consistent with that earlier approach, we conclude that the Plaintiff has failed to present a sufficient showing to allow a reasonable trier of fact to conclude that her termination was an act of reprisal for the filing of her EEOC charges. As noted, the Defendant has attributed the closing of the Ambulance Service, and the resultant termination of the Plaintiff's position, to irreconcilable problems in staffing, and the Record substantiates that these concerns extended back to at least February of 1992—well before the Plaintiff filed her initial EEOC complaint. Thus, she cannot responsibly demonstrate that her protected conduct was a substantial or motivating factor in her discharge.

▉ For the same reasons which were earlier addressed in conjunction with the Plaintiff's Title VII and MHRA reprisal claims, we conclude, however, that the Plaintiff has offered a showing which withstands Summary Judgment as to her First Amendment reprisal claim for acts other than her discharge. At this preliminary juncture, we find that the Plaintiff has provided an adequate demonstration that the pertinent actions of the Defendant's agents—specifically, those surrounding the letter-reading incident at the City Council meeting, and Beighley's attempts to publicize unfavorable information concerning the Plaintiff's job performance— were prompted by the filing of her first EEOC charge.

Having carried her initial burden, the onus shifts to the Defendant to demonstrate that it would have taken the same challenged actions, even in the absence of the Plaintiff's protected conduct. Here, however, the Defendant offers no such demonstration and, in fact, it has not substantively addressed the merits of any of the Plaintiff's First Amendment claims. Accordingly, as the Defendant has failed to satisfy its burden under *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* supra, it is not entitled to Summary Judgment on this aspect of the Plaintiff's First Amendment claim.

In sum, the Defendant's Motion for Summary Judgment on the Plaintiff's First Amendment claim of retaliation, other than that which is related to her discharge, is denied, and its Motion for Summary Judgment on the Plaintiff's remaining Section 1983 claims is granted.[26]

NOW, THEREFORE, It is—

ORDERED:

1. That the Defendant's Motion for Summary Judgment on Count I of the Plaintiff's Complaint [Docket No. 14] is GRANTED in part, and DENIED in part.

2. That the Defendant's Motion for Summary Judgment on Count II of the Plaintiff's Complaint [Docket No. 14] is GRANTED in part, and DENIED in part.

---

**26.** Given these rulings, we have no occasion to address the Defendant's additional request that

we decline to exercise supplemental jurisdiction over the Plaintiff's remaining State law claims.

3. That the Defendant's Motion for Summary Judgment on Count III of the Plaintiff's Complaint [Docket No. 14] is GRANTED in part, and DENIED in part.

4. That the Defendant's Motion for Summary Judgment on Count IV of the Plaintiff's Complaint [Docket No. 14] is GRANTED.

5. That the Defendant's Motion for Summary Judgment on Count V. of the Plaintiff's Complaint [Docket No. 14] is GRANTED in part, and DENIED in part.